UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  ___5/12/16___
```

KENNEDY BROWN,                          :

                       Petitioner,          :

         - against -              :

THOMAS GRIFFIN, Superintendent,         :

                  Respondent.          :

--------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
<u>ALVIN K. HELLERSTEIN</u>**

13cv1352-AKH-FM

**FRANK MAAS**, United States Magistrate Judge.

I.    <u>Introduction</u>

        Petitioner Kennedy Brown ("Brown") brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254 ("Section 2254") to challenge his conviction, following a jury trial in Supreme Court, New York County, on three counts of Robbery in the Second Degree, and one count each of Robbery in the First Degree and Criminal Possession of a Weapon in the Second and Third Degrees.  On September 24, 2008, Justice Maxwell Wiley, before whom the case was tried, sentenced Brown on these charges, as a persistent felony offender, to concurrent indeterminate terms of twenty-five years to life.

        In his petition, (ECF No. 3 ("Petition" or "Pet.")), Brown contends that he was denied his Sixth Amendment right to counsel and his Fourteenth Amendment due process right to prepare and present a defense because Justice Wiley (a) refused to grant defense counsel's request for an adjournment so that he could properly prepare for trial, and (b) refused to appoint new counsel for Brown despite his request.

For the reasons set forth below, the Petition should be denied.  Additionally, because Brown has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

II.     Background

    A.     Trial

        1.     People's Case

The People's proof at trial would have permitted a reasonable juror to find as follows:

On October 8, 2005, Steven Stiffman ("Stiffman") and Edwin Hernandez ("Hernandez") were working at a Rent-A-Center store in Manhattan.  Around 6:50 p.m., two armed men entered the store.  (Tr. 34-36, 38, 164).[1]  The first man, later identified as Brown, was approximately five feet, six inches tall, was holding a gun with a silver barrel, and was wearing a green jacket, a face mask, and what looked like a gray hooded sweatshirt.  (Id. at 39-41, 50, 101, 105, 131-32).  The second man was wearing a large

---

[1]     "Ex." refers to the exhibits to the Petition.  "H" refers to the transcript of the pretrial proceedings before Justice Wiley.  (ECF No. 12-2).  "Tr." refers to the trial transcript.  (ECF Nos. 12-3, 12-4).  "S." refers to the minutes of Brown's sentencing.  (ECF No. 12-5).

There are a number of instances where portions of the transcript are either missing or illegible.  (See, e.g., Tr. 453-470, 769-71).  Although this made review more difficult, it did not preclude full consideration of Brown's claims.

winter coat and a hooded sweatshirt and was holding a gun with a black barrel.  (Id. at 39-40).[2]

As the men entered, Hernandez was engaged in a telephone conversation with the store's manager, Joel Coss ("Coss"), which Brown ordered Hernandez to terminate.  (Id. at 127, 144-45, 255).  Moments later, Brown shouted that, "if he didn't find what he was looking for, he[] [would] kill everybody."  (Id. at 130).  He then hit Stiffman in the back of his head with his gun and threw him to the ground.  (Id. at 40-41, 97, 115, 130-31).  As Stiffman lay on the ground, Brown ordered him to open the store's safe, stating that he would shoot Hernandez if Stiffman did not comply.  (Id. at 40, 89, 130).  Stiffman responded that he could not open the safe at that time of day, but invited Brown to take the money in the cash register.  (Id. at 42, 44-45, 97, 130).  Brown removed that cash and then ordered Stiffman, Hernandez, and another employee to lead him to the store manager's office.  (Id. at 45, 47-48).  Once there, Brown directed the three employees to lie face down on the floor and stay there until he and his accomplice had left the store, threatening that "there [were] more people outside."  (Id. at 48).

Meanwhile, having overheard some of what had occurred, Coss called the police to report the robbery.  (Id. at 255).  Officers Ahmed and Hoffman responded to the report, arriving at the store just as the two men were exiting.  (Id. at 164-68, 170, 173, 175, 505-09).  As the suspects approached the middle of the street, Officer Ahmed called

---

[2]     Although both men had their faces covered, Stiffman could see Brown's forehead and determined that he was African-American.  (Id. at 41-42, 50).

out to them to "come here."  (Id. at 175-76).  The two men then noticed the officers and began to run.  (Id. at 175-76, 509).  Officer Ahmed pursued them on foot while Officer Hoffman returned to the patrol car.  (Id. at 177-79, 509-10).  As Officer Ahmed ran, he relayed his route over his police radio.  (Id. at 177, 512).

At some point during the chase, Officer Ahmed saw Brown make a throwing motion with his right hand, but could not tell what, if anything, Brown had discarded.  (Id. at 180-81).  Around that same time, Officer Ahmed saw a baseball cap blow off Brown's head.  (Id. at 193).

As the two suspects attempted to flee, they split up, with Brown running north and the other man running south.  By this time, several auxiliary police officers who heard Officer Ahmed's transmissions had joined the chase.  (Id. at 182-83, 282-86, 440-43).  Officer Ahmed and two of the auxiliary police officers chased Brown's companion, while an auxiliary police lieutenant helped chase Brown.  (Id. at 183-84, 288, 444).  After a few chaotic minutes, the police were able to apprehend Brown, but his accomplice escaped.  (Id. at 184, 288-93).

The officers detaining Brown were directed to stay with him "until the investigation was completed."  (Id. at 382-83).  As Brown was being held, he volunteered to the police that "he didn't pistol-whip anybody" and "didn't do anything."  (Id. at 384).  Prior to these statements, however, the police had said nothing to Brown to suggest that the crime under investigation involved a "pistol-whipping."  (Id. at 385-86).

Along the route that Brown had traveled, the police eventually recovered United States currency, which a police officer placed in Brown's left front pants pocket. (Id. at 382). The police also recovered a 9 millimeter pistol and magazine and Brown's baseball cap in approximately the area where Officer Ahmed had seen Brown make the throwing motion. (Id. at 192-94, 293-94, 348-49, 479-86). A subsequent inspection confirmed that the magazine contained one live round. (Id. at 479). Another weapon, a .38 caliber revolver, was recovered along the route that the second suspect had traveled before escaping from the police. (Id. at 190, 275-76, 484). That weapon was not loaded. (Id. at 275-76).

After Officer Hoffman identified Brown as one of the persons who she had seen in front of the Rent-A-Center store, Brown was arrested and taken to a local precinct for processing. (Id. at 515-17). At the precinct, Officer Hoffman searched Brown's person, finding $103 in his pants and $450 and surgical gloves in his jacket. (Id. at 517-20). Later that evening, Coss provided the police with surveillance camera footage that depicted aspects of the robbery. (Id. at 54-67, 271-72). The following day, Coss counted the money in the cash register and the safe, and determined that $484.95 was missing. (Id. at 256).

### 2.   Defense Case

Brown called four witnesses to testify on his behalf. The first was Detective Reynaldo Hernandez, who had been assigned to investigate the Rent-A-Center robbery. As part of that investigation, Detective Hernandez interviewed a number of

5

employees at Famous Fish, a store where Brown had been employed.  That store was located approximately two blocks from the site of the Rent-A-Center store.  Detective Hernandez did not testify to the content of his interviews.  (Id. at 596-99).

Next, Brown called Alex Ross, the owner of Famous Fish.  (Id. at 601). Ross testified that on the date of the robbery, he was out of the country but had left Brown in charge of the store.  (Id. at 604).  According to Ross, while he was away, Brown was responsible for removing the cash from the store's cash register at 6 p.m. and placing it in a safe in Ross' apartment across the street.  (Id. at 604-07).  Ross also testified that Famous Fish employees were given latex gloves to wear while handling the fish, although he conceded that they generally threw them away before leaving the store because of the fish odor.  (Id. at 613).

Brown also called Odeis Stephenson, one of his coworkers at Famous Fish. Stephenson testified that he was assigned to work the 6 p.m. shift at Famous Fish on the date of the robbery.  Just before his shift, at around 5:30 p.m., Stephenson went to Brown's apartment across the street from the store to change into his work clothes. Brown opened the door for him and let him into the apartment.  Stephenson testified that this was the last time he saw Brown that day.  (Id. at 615-18).

Finally, Brown called Officer John Robinson to the stand.  Officer Robinson was one of the officers who guarded Brown before he was removed from the arrest scene.  Officer Robinson testified that Brown remained "calm" but commented that he "didn't pistol-whip nobody" and "didn't rob all these people."  (Id. at 641).

6

B.    <u>Pretrial Proceedings</u>

Following his arrest, Brown was indicted on three counts of Robbery in the

Second Degree, and one count each of Robbery in the First Degree and Criminal

Possession of a Weapon in the Second and Third Degrees.  (<u>See</u> Ex. C).

James McQueeny, Esq., of the Legal Aid Society, initially served as

Brown's appointed counsel.  In early July 2006, approximately nine months after

Brown's arrest, the trial court granted Brown's <u>pro se</u> request for new counsel and

appointed Neville Mitchell, Esq., to represent him.  (Exs. D-1, D-2).  Two days later, Mr.

Mitchell attended a pretrial status conference.  At that proceeding, Justice Wiley indicated

that he would not permit the substitution of counsel to "unduly delay" the trial.  (Ex. D-1

at 3).  Justice Wiley assured Mr. Mitchell, however, that he would "allow [him] to take a

look at the previous motions so [he would] at least know what the case [was] about."

(<u>Id.</u>).  Justice Wiley then asked whether Mr. Mitchell could be ready to try the case on

July 18.  After Mr. Mitchell responded that he was unavailable, Justice Wiley set July 19

as a "control" date, on which he would select the trial date.  (<u>Id.</u> at 3-4).

When the parties returned on July 19, the prosecutor informed the court that

Mr. McQueeny had yet to turn over to Mr. Mitchell certain of the People's discovery

items, including the surveillance video of the robbery.  The prosecutor therefore agreed to

make new copies of those items for him.  (Ex. D-3 at 2-3).  Both the prosecutor and Mr.

Mitchell asked the court to accommodate them by postponing the trial until the first week

of September.  (<u>Id.</u> at 2).  Instead, Justice Wiley set an August 31 trial date.  (<u>Id.</u> at 3).

On August 30, Mr. Mitchell informed the trial court by fax that he could not appear the next day because he had to leave the country until September 5 to attend a funeral. Mr. Mitchell thus requested an adjournment until at least September 13. (Ex. D-4). The court granted that request, adjourning the case until September 20, 2006. (See ECF No. 4 ("Pet'r's Mem.") at 8).

On September 20, Mr. Mitchell advised Justice Wiley that he would adopt the motions filed by Brown's predecessor counsel and would not challenge any of the court's prior rulings despite the filing of a superseding indictment. (Ex. D-5 at 2). After conferring with Brown, Mr. Mitchell further indicated that they were "not interested" in the prosecution's plea offer of a term of sixteen years to life in exchange for a guilty plea to a Class C felony. (Id. at 3). Justice Wiley then granted the prosecution's request to put the case over until November 8. (Id.).

On the morning of November 8, although Brown was produced, Mr. Mitchell faxed the court to say that he could not appear for the scheduled hearing because he was ill. (Ex. D-6). Justice Wiley therefore adjourned the case until November 27. (Ex. D-7 at 2).

When the parties appeared in court on November 27, the prosecutor requested a one-day adjournment for reasons explained off the record. Mr. Mitchell also handed up to Justice Wiley Brown's pro se motion seeking yet another appointment of replacement counsel. (Exs. D-8, D-9 at 2). In his papers, Brown complained that Mr. Mitchell never met with him to discuss his case, failed to inform him about any motion

practice, and did not show him any pretrial discovery.  Brown contended that he thus had

been deprived of an adequate opportunity to prepare his defense, in violation of his right

to due process.  (Ex. D-8 ¶¶ 4-15).  In addition, Brown argued that Mr. Mitchell's lack of

preparation amounted to ineffective assistance of counsel in violation of the Sixth

Amendment.  (Id.).

      Justice Wiley denied Brown's motion, even though Mr. Mitchell conceded

that "much of what [Brown said in the] application in fact has truth in it[,] in so far as . . .

he is saying he has not been able to consult with me."  (Ex. D-9 at 2-3).  As Mr. Mitchell

explained, he had "made several attempts to see . . . Brown on Rikers Island," but had

gotten "caught up" in security procedures and had not had an opportunity to meet with

him.  (Id.).  Mr. Mitchell's effort to have Brown produced at 100 Centre Street also was

unsuccessful.  Mr. Mitchell opined that, with his then-current level of preparation, he

could do a "competent job" representing Brown, but was not prepared to begin the

hearings the following day.  He requested that the matter be put over for about a week so

that he could meet with Brown to discuss the case.  (Id. at 4).

      Justice Wiley denied both Brown's application for new counsel and Mr.

Mitchell's request for an adjournment.  In doing so, Justice Wiley told Mr. Mitchell that

he and his client could "spend as much time as you need together today," would "be

together all day tomorrow for the pretrial hearing," and could "spend as much time

[together] as you can on Wednesday," when no proceedings were scheduled.  (Id.).

Justice Wiley also noted that Mr. Mitchell had "been on the case since the summer," and

that if the trial did not start soon, Brown would "wind up sitting in jail until 2007."  (Id. at 4-5).

When the parties appeared in court the following morning to begin the pretrial hearings, Mr. Mitchell told Justice Wiley that he had done his best to prepare, but wanted to reiterate his concerns regarding his level of preparation.  Mr. Mitchell indicated that he had attempted to speak with Brown after the court proceedings the previous day, but was unable to find Brown by the time he reached the holding facility, and was told that he likely had been taken back to Rikers Island.  Mr. Mitchell also once again requested a continuance, stating, "[at] the peril of malpractice, I am saying to the Court I have not really discussed the case [with Brown]."  (H. 4-7).

The court acknowledged Mr. Mitchell's concerns, but remarked that the case was fairly straightforward.  Inasmuch as the charges arose out of a single incident and were not "the result of a lengthy . . . pretrial investigation," Justice Wiley stated that the suppression hearing would be held that day, but gave Mr. Mitchell until 11:30 a.m. – approximately forty minutes – to review certain recently-received Rosario material.[3]  (Id. at 8-10).  In an effort to be "fair to both sides," Justice Wiley also directed that jury selection and the start of trial would be adjourned until Thursday – two days later – so that Mr. Mitchell would have some additional time to prepare.  (Id.).

---

[3]      Although the People are required by statute to turn over any written or recorded statements of their witnesses relating to the subject matter of their testimony, see N.Y. Crim. Proc. Law ("CPL") § 240.20, the matter disclosed is often called "Rosario" material because the duty to make it available to the defense first was imposed by the New York Court of Appeals in a case bearing that name, see People v. Rosario, 9 N.Y.2d 286 (1961).

At approximately 12 p.m., the court began the suppression hearing, which continued until Thursday afternoon.  During that hearing, the prosecution called four witnesses, each of whom Mr. Mitchell cross-examined.  (Id. at 11-209).  Thereafter, Justice Wiley reserved decision on the suppression motions and postponed jury selection until the following Monday morning.  (Id. at 221-23).  Justice Wiley indicated that it was not his practice to make comments in the middle of a case, but told Mr. Mitchell that, although "you said you were not prepared[,] I would say based on your performance . . . you are at least giving the impression of a lawyer who knows what he is doing."  (Id. at 66).

     C.    <u>Verdict, Post-Verdict Proceedings, and Sentencing</u>

Brown's trial commenced on Tuesday, December 5, 2006.  (Tr. 1).  On December 15, the jury found Brown guilty of each count in the indictment.  (Id. at 773).  Sentencing originally was scheduled for January 17, 2007.  For health and other personal issues, however, Mr. Mitchell secured several adjournments over the next few months.  (See Exs. D-10, D-11).

It appears that, based on Mr. Mitchell's repeated failures to appear, on or about May 30, 2007, the court relieved him of his duties and appointed Robert Briere, Esq., to represent Brown.  (Pet'r's Mem. at 17; S. 10).  Mr. Briere then evidently filed a motion to set aside Brown's verdict pursuant to Section 330.30 of the CPL based on Mr. Mitchell's allegedly deficient representation.  (S. 7).  That motion subsequently was denied.  (Id.).

On September 24, 2008, Justice Wiley sentenced Brown, as a persistent violent felony offender, to concurrent, indeterminate prison terms of twenty-five years to life on each of the counts in the indictment.  (Id. at 10-11).

D.    Subsequent Procedural History

1.    Direct Appeal

In his appeal to the Appellate Division, First Department, Brown advanced six claims.  Specifically, Brown contended that:  (a) the trial court violated his right to counsel and his right to prepare and present a defense by denying his request for substitution of counsel and refusing to adjourn his trial; (b) his trial counsel was ineffective; (c) the evidence was insufficient to establish his guilt with respect to the first degree robbery charge; (d) New York's persistent violent felony offender statute was unconstitutional; and (e) his sentence was excessive and unconstitutionally harsh.  (Ex. B-4).

On December 20, 2011, the Appellate Division unanimously affirmed Brown's conviction.  See People v. Brown, 934 N.Y.S.2d 414 (1st Dep't 2011).  The Appellate Division first held that the trial court had not deprived Brown of his constitutional rights by denying his second motion for the appointment of new counsel. As the court explained, a criminal defendant "must demonstrate 'good cause' for the appointment of substitute counsel, such as conflict of interest or other irreconcilable conflict, and is not entitled to the appointment of successive lawyers at his or her option." Id. at 415.  In that regard, the court noted that Brown's motion papers were devoid of any

12

allegations that would have required the trial court to "engage in a minimal inquiry of

[Brown] as to the nature of his disagreement with counsel or its potential for resolution."

Id.  The court also stated that Justice Wiley had "afforded defense counsel a sufficient

opportunity to consult with [Brown] both before and during the suppression hearing, and

between the hearing and trial."  Id.

   The Appellate Division then considered Brown's claim concerning the

denial of his request for an adjournment.  The court determined that Brown had "failed to

preserve" this claim, and declined to review it in the interest of justice.  Id.  In an

alternative holding, the court also rejected the claim on its merits.  As the court observed,

the decision to grant an adjournment "lies in the sound discretion of the trial court, and

the exercise of that discretion in denying or partially granting an adjournment will not be

disturbed absent a showing of prejudice."  Id. (citations omitted).  Since Justice Wiley

had granted counsel several full days to consult with Brown before the trial actually

commenced, the Appellate Division found that Brown had been "afforded a meaningful

opportunity to consult with his attorney and therefore ha[d] shown no prejudice."  Id.

   The Appellate Division next turned to Brown's ineffective assistance of

counsel claim, and found that, to the extent the record permitted review, counsel had

effectively represented Brown at trial.  Despite Mr. Mitchell's suggestion that he had not

adequately prepared for trial, the court noted that he had "thoroughly cross-examin[ed]

witnesses, lodg[ed] a number of pertinent objections during both the suppression hearing

and the trial, and present[ed] cogent arguments for suppression and in support of the

misidentification defense." Id.  The court further found that, even if Mr. Mitchell had

erred, Brown's claim failed under both the federal and state standards pertaining to

ineffective assistance of counsel because Brown could not establish prejudice given the

"overwhelming evidence of [his] guilt" presented at trial.  Id.

Finally, the Appellate Division rejected Brown's sufficiency-of-the-

evidence claim and his constitutional challenge to the persistent violent felony offender

statute, finding that Brown had failed to preserve both claims below.  In an alternative

holding, the court also rejected both claims on their merits.  Id.

By letter dated January 31, 2012, Brown sought leave to appeal his case to

the New York Court of Appeals based on each of the issues raised in his direct appeal.

(Ex. A-3).  In particular, Brown urged the court to determine whether the circumstances

of his case required the trial court to conduct a "minimal inquiry" into the request for

substitute counsel.  (Id. at 6-8).  The Court of Appeals denied Brown's leave application

by order dated February 28, 2012.  (Ex. A-1).

2.      Habeas Petition

On February 25, 2013, Brown's appellate counsel, the Office of the

Appellate Defender, filed a Petition for a writ of habeas corpus on Brown's behalf.  (Pet.).

In that Petition, Brown contends that the trial court denied him his Sixth Amendment

right to the effective assistance of counsel and his Fourth Amendment right to prepare and

present a defense by refusing to appoint substitute counsel or grant an adjournment.

(See Pet'r's Mem.).

14

On March 19, 2013, the Honorable Harold A. Baer, Jr., referred the Petition to me for a Report and Recommendation.  (ECF No. 5).  The Respondent filed a memorandum of law in opposition to Brown's Petition on August 14, 2013, (ECF No. 14 ("Resp't's Mem.")), and Brown filed a reply memorandum on September 24, 2013, (ECF No. 17 ("Reply")).  The Petition consequently is fully submitted.

III.   Discussion

A.   Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application of</u>, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in <u>Jones v. Stinson</u>, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" 229 F.3d 112, 119 (2d Cir. 2000). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409. This standard does not require that reasonable jurists all would agree that the state court was wrong. <u>Id.</u> at 409-10. Rather, the standard "falls somewhere between 'merely erroneous' and 'unreasonable to all reasonable jurists.'" <u>Jones</u>, 229 F.3d at 119 (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) further authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). To the extent that a habeas petition

challenges factual findings, however, Section 2254(e)(1) provides that "a determination

of a factual issue made by a State court shall be presumed to be correct" and "[t]he

[petitioner] shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence." Id. § 2254(e)(1).

Section 2254 thus embodies a "'difficult to meet' . . . and 'highly

deferential standard . . . which demands that state-court decisions be given the benefit of

the doubt.'"  Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (quoting Harrington v.

Richter, 562 U.S.86, 102 (2011); Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per

curiam)).  Despite this standard, however, if "a federal court is convinced that a prisoner's

custody . . . violates the Constitution, that independent judgment should prevail."

Williams, 529 U.S. at 389.

    B.    Procedural Default

A federal habeas court generally is precluded from reviewing a petitioner's

claim if the state court's denial of it rested on an adequate and independent state ground.

See, e.g., Harris v. Reed, 489 U.S. 255, 260 (1989); Wainwright v. Sykes, 433 U.S. 72, 81

(1971).  A petitioner's failure to comply with a state procedural rule qualifies as such an

adequate and independent state ground, provided that (1) the state court actually "relied

on the procedural bar as an independent basis for its disposition of the case," Harris, 489

U.S. at 261-62 (internal quotation marks and citation omitted), and (2) the state

procedural rule is "firmly established and regularly followed," Cotto v. Herbert, 331 F.3d

217, 239-40 (2d Cir. 2003) (quoting Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999))

(internal quotation marks omitted).  A claim rejected under these circumstances is considered "procedurally defaulted."  Coleman v. Thompson, 501 U.S. 722, 731 (1991).

In determining whether to deny a habeas claim on the basis of a procedural default, federal courts "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'"  Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting Stinson, 229 F.3d at 118).  When the last state court to issue a reasoned decision relies on a state procedural bar, however, a court reviewing a habeas petition will presume that subsequent decisions rejecting the claim without discussion relied on the bar and did not silently consider the merits.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  Furthermore, even if the state court proceeds to consider the merits of the claim, its reliance on a procedural ground as one basis for the denial of the claim generally precludes habeas review.  Garcia, 188 F.3d at 77; Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

There is a narrow exception permitting federal review despite a petitioner's default when a petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.  To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" that explains why he did not raise the claim previously.  Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).

18

A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness.  See Carrier, 477 U.S. at 493-94.  Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent."  See Schlup v. Delo, 513 U.S. 298, 324 (1995); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).

      C.    Denial of Request for Adjournment

        1.    Procedural Default

Brown contends that the denial of Mr. Mitchell's request for an adjournment deprived him of his constitutional rights.  (Pet'r's Mem. at 22-24, 26-29).  According to the Respondent, this claim is procedurally defaulted and thus cannot serve as a basis for federal habeas relief.  The alleged procedural default arises out of Mr. Mitchell's failure to preserve the claim for appellate review by making a timely specific objection to the denial of his request.  (Resp't's Mem. at 30-32).  Brown does not appear to dispute that his adjournment claim is procedurally defaulted, but maintains that the Court nonetheless should reach the merits of the claim because he has established cause for his default and prejudice resulting therefrom.  (See Reply at 12-14).

The Appellate Division concluded that Brown had "failed to preserve his claim that he was deprived of [effective] counsel by the court's refusal to grant" Mr. Mitchell's request for an adjournment on the eve of trial.  Brown, 934 N.Y.S.2d at 415.  Although the Appellate Division did not specifically explain the basis for this

determination, it presumably is based on New York's contemporaneous objection rule, which preserves for review only those questions of law as to which "a protest . . . was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." CPL § 470.05.

The federal courts have recognized New York's "contemporaneous objection rule" to be a "firmly established and regularly followed . . . procedural rule" that generally "constitutes an independent and adequate state law ground for disposing of a claim." Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011) (collecting cases). Nonetheless, if the state court lacked a "fair and substantial basis" for applying the rule in this case, the Court is not bound by the state court's procedural default determination. See Garcia, 188 F.3d at 78. Thus, if the state court makes "an unsupported or manipulative finding of procedural default" with respect to a particular claim, the claim will not be considered barred from federal habeas review. Silverstein v. Henderson, 706 F.2d 361, 367 n.11 (2d Cir. 1983).

Here, it is unclear what more Mr. Mitchell could have done to make a record of his objections to proceeding without an adjournment. After Justice Wiley initially denied the request for a one-week adjournment on November 27, (see Ex. D-9 at 4), Mr. Mitchell renewed his request the following day, stating:

> I believe judge that the person[] whose rights are at stake here
> is Mr. Brown, not mine at the end of the day . . . . I am
> not . . . asking for two months. Indeed, Your Honor, I would

> even be willing to ask for two days to be able to [confer with
> Brown]. . . .  I am not saying I don't want to represent him.
> All I am saying is he should get proper representation.  And at
> this point, [at] the peril of malpractice, I am saying to the
> Court I have not really discussed the case [with Brown] . . . .
> I am just not prepared to go[,] but I will do whatever the
> Court instructs me to do."

(H. 5-7).

  Although Mr. Mitchell thus ultimately deferred to Judge Wiley's wishes, it is hard to see what further statements he could have made to convey to the court his view that the case should be adjourned.  Certainly, a boilerplate request to "note" his objection to the court's decision to proceed would have added little, if anything, to the discussion. In these circumstances, the Appellate Division's determination that Brown's adjournment request was unpreserved may well have lacked an adequate basis in state law, thereby permitting habeas review.  Compare Cotto, 331 F.3d at 245-46 (contemporaneous objection rule not an adequate state ground for denying appellate review because counsel "substantially complied" by "ma[king] his position with respect to the ruling known to the court") (internal quotation marks omitted), with People v. Quinones, 670 N.Y.S.2d 14, 14 (1st Dep't 1998) (claim related to denial of defendant's request for adjournment deemed procedurally defaulted because counsel completely acquiesced in the court's ruling without voicing further objection).

  There is no need to resolve this question, however, because Brown's Sixth Amendment claim regarding the denial of his adjournment request plainly does not entitle him to habeas relief.  Accordingly, I will turn to the merits of that claim.

2.    <u>Merits</u>

As the Appellate Division accurately noted, whether to grant an adjournment is a decision that lies within the sound discretion of the trial court, and the exercise of that discretion ordinarily cannot be overturned absent a showing of prejudice. <u>See</u> <u>Morris v. Slappy</u>, 461 U.S. 1, 11-12 (1983); <u>Ungar v. Sarafite</u>, 376 U.S. 575, 589 (1964); <u>United States v. Weinberg</u>, 852 F.2d 681, 687 (2d Cir. 1988).  Accordingly, to obtain habeas relief based on his adjournment claim, Brown must establish that the denial of Mr. Mitchell's request for an adjournment somehow impaired his defense of the case. <u>See</u> <u>United States v. Cronic</u>, 466 U.S. 648, 662 n.31 (1984) (fact that counsel was given very limited time to prepare does not "justify reversal of [a defendant's] conviction absent an actual effect on the trial process or the likelihood of such an effect.").

In its alternative holding, the Appellate Division rejected Brown's adjournment claim on the merits, stating that Brown had been "afforded a meaningful opportunity to consult with his attorney" for "almost a full day . . . in preparation for the hearing" and "effectively [had] received more than the two-day adjournment [counsel] last requested and more than the one-week adjournment [counsel] initially sought for trial preparation."  <u>Brown</u>, 934 N.Y.S.2d at 415.   The Appellate Division further opined that, notwithstanding Mr. Mitchell's initial lack of preparation, Brown had "received effective assistance of counsel under both the federal and state standards."  <u>Id.</u>  Indeed, the court found that Mr. Mitchell had provided "meaningful representation" at the suppression hearing and at trial by "thoroughly cross-examining witnesses, lodging a number of

22

pertinent objections . . . , and presenting cogent arguments for suppression and in support

of the misidentification defense." Id. at 416.  Accordingly, the court concluded that

Brown had failed to establish that he was "prejudiced by any of counsel's alleged

omissions." Id.

   In his Petition, Brown suggests that the Appellate Division should have

applied a presumption of prejudice to this case without considering Mr. Mitchell's actual

performance.  In support of this proposition, Brown relies on language in Cronic

recognizing that there are circumstances where "the likelihood that any lawyer, even a

fully competent one, could provide effective assistance is so small that a presumption of

prejudice is appropriate without inquiry into the actual conduct of the trial."  (Pet'r's

Mem. at 26 (quoting Cronic, 466 U.S. at 659-60)).  Suffice it to say, in Cronic, the

Supreme Court made that observation based on the facts of Powell v. Alabama, 287 U.S.

45 (1932), its decision arising out of the infamous trials of the Scottsboro Boys – black

youths accused of raping two white girls who were sentenced to death after a one-day

trial that commenced six days after indictment and "only moments after counsel for the

first time charged with any degree of responsibility began to represent them."  287 U.S. at

58.  Moreover, the attorney who represented the defendants in Powell was from out of

town and had "no opportunity" to investigate the facts before the trial began.  Id. at 57-69.

   Recognizing that Powell involved uniquely egregious facts, the Supreme

Court cautioned in Cronic that not "every refusal to postpone a criminal trial will . . . give

rise to . . . a presumption" of prejudice.  466 U.S. at 661.  Accordingly, in the typical case,

a reviewing court must look to the "surrounding circumstances" to determine whether a reasonable attorney in defense counsel's shoes could have "function[ed] in any meaningful sense as the [People's] adversary." Id. at 666.  That inquiry, of course, is highly-fact bound.  For that reason, in Cronic, the Court remanded the case so that the Court of Appeals could consider whether the alleged assignments of error had deprived the defendant of a fair trial.  Id. at 667.

In support of its holding that not every denial of an adjournment gives rise to a presumption of ineffectiveness, the Supreme Court cited its decision in Avery v. Alabama, 308 U.S. 444 (1940).  There, counsel was appointed to represent a defendant facing the death penalty a mere three days before trial, and the trial court denied counsel's request for additional time to prepare.  Nonetheless, the Supreme Court held that, because the witnesses and evidence were easily accessible to counsel, it was not unreasonable to expect that counsel could adequately prepare for trial during that period of time.  Avery, 308 U.S. at 450-53.

More recently, in Chambers v. Maroney, 399 U.S. 42 (1970), the Supreme Court held that a defendant received effective assistance of counsel despite defense counsel's failure to confer with his client until a few minutes before trial began.  399 U.S. at 53-54.  Although the defendant in that case contended that counsel's "appearance . . . was so belated that he could not have furnished effective legal assistance," the Court of Appeals rejected that assertion because the record established that counsel's late appointment had not resulted in any prejudice.  Id. at 53.  In the course of affirming that

24

decision, the Supreme Court refused to "fashion a per se rule requiring reversal of every conviction following tardy appointment of counsel." Id. at 54. Given the Court of Appeals' factual determination regarding the lack of prejudice, the Supreme Court held that it had properly rejected the petitioner's Sixth Amendment claims. Id.

Finally, in Slappy, the Court reiterated that "broad discretion must be granted trial courts on matters of continuances" and that "not every restriction on counsel's time or opportunity to investigate or to consult with his client . . . violates a defendant's Sixth Amendment right to counsel." 461 U.S. at 11. In that case, counsel had managed to obtain a "hung jury" on the two most serious charges against the client to whom he had been assigned only six days prior to trial. Accordingly, the Court found no merit to the defendant's Sixth Amendment claims on habeas review. Id. at 12.

Here, although Mr. Mitchell may not have extensively discussed Brown's case with him prior to trial, he had been assigned to the case for several months by the time the suppression hearing was held and was afforded an ample opportunity to familiarize himself with the case file. Additionally, the relevant facts were hardly complicated. Mr. Mitchell also clearly had time to fashion a defense – namely, that this was a case of misidentification – and to locate witnesses who could bolster that defense. Finally, despite the denial of Mr. Mitchell's request for an adjournment of the suppression hearing, Justice Wiley afforded Mr. Mitchell six full days between the start of the suppression hearing and the trial to meet with Brown to discuss trial strategy. In light of these circumstances, it was not unreasonable to expect that a competent attorney could

render effective assistance both at the hearing and the trial.  A presumption of prejudice

therefore is not warranted.[4]

Absent a presumption of prejudice, Brown must establish that Mr. Mitchell

did not reasonably function as his defense counsel because his request for an adjournment

was denied.  This he plainly cannot do.  In fact, despite the denial of the adjournment, Mr.

Mitchell appears to have provided meaningful representation at both the suppression

hearing and the trial.  As the Appellate Division noted, Mr. Mitchell "thoroughly cross-

examin[ed] witnesses," raised "a number of pertinent objections," and "present[ed]

cogent arguments for suppression and in support of [Brown's] misidentification defense."

Brown, 90 A.D. 3d at 546; (see H. 199-202, 210-11).  Mr. Mitchell also presented two

defense witnesses to establish that Brown had worked at Famous Fish on the day of the

robbery, and that Brown was responsible for depositing the store's cash in Ross'

apartment, thus potentially explaining why Brown had relatively large sums of money on

his person at the time of his arrest.  (Tr. 604-18).  Finally, Mr. Mitchell delivered a

---

[4]         In his Reply, Brown notes that the Supreme Court has presumed the existence of
prejudice in cases in which the defendants were denied counsel during the "critical stage"
between arraignment and trial.  (See Reply at 5 (citing Cronic, 466 U.S. at 659 n.25)).  Indeed, a
defendant clearly has an absolute right to be represented by counsel with respect to several
potential proceedings during that stage of a criminal case.  See, e.g., Missouri v. Frye, 132 S. Ct.
1399 (2012) (plea negotiations); Argersinger v. Hamlin, 407 U.S. 25 (1972) (guilty plea); United
States v. Wade, 388 U.S. 218 (1967) (postindictment lineup); Massiah v. United States, 377 U.S.
201 (1964) (postindictment interrogation); Hamilton v. Alabama, 368 U.S. 52 (1961)
(arraignment).  Here, however, there is no suggestion that Mr. Mitchell was either totally absent
or had failed to conduct any investigation of the case during that period of time.  Rather,
Brown's assertion is simply that Mr. Mitchell failed to meet with him prior to the pretrial
hearing.  Assuming that is true, it clearly does not amount to the denial of counsel during a
critical stage of Brown's case.

persuasive summation in which he reiterated the misidentification theory and forcefully

argued for acquittal.  (Id. at 658-81).

For these reasons, the Appellate Division reasonably rejected Brown's Sixth

Amendment claim to the extent that it was based on the trial court's denial of his

counsel's request for an adjournment.  It follows that this claim provides no basis for

habeas relief.

### D.   Failure to Appoint Substitute Counsel

Brown also contends that the trial court deprived him of his Sixth

Amendment rights by denying the application for the appointment of substitute counsel

that he submitted on the eve of the trial.  (Pet'r's Mem. at 25-26).  The Appellate Division

concluded with respect to this claim that Brown had failed to demonstrate good cause for

the court to act.  As the Appellate Division explained, Brown had not even advanced any

"allegations . . . that would [have] require[d] the trial court to engage in a minimal inquiry

. . . as to the nature of his disagreement with counsel or its potential for resolution."

Brown, 934 N.Y.S.2d at 415.  In his reply papers, Brown contends that the Appellate

Division's determination with respect to this issue constituted an "unreasonable

application" of clearly established Sixth Amendment principles.  (See Reply at 6-11).

Although courts ordinarily need not consider arguments raised for the first time in reply,

see, e.g., Melo v. United States, 825 F. Supp. 2d 457, 464 (S.D.N.Y. 2011), I am mindful

that Brown is serving a very long sentence.  Accordingly, I will overlook this infirmity

and address the merits of his claim.

The Sixth Amendment right to counsel includes the right to have the assistance of counsel who meets an objective standard of reasonableness and who is conflict free.  See Strickland v. Washington, 466 U.S. 668, 687 (1981); Armienti v. United States, 234 F.3d 820, 823 (2d Cir. 2000).  It does not, however, "guarantee[] a meaningful relationship between an accused and his counsel."  Slappy, 461 U.S. at 14 (internal quotation marks omitted).  Thus, "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  Wheat v. United States, 486 U.S. 153, 159 (1988).

A trial court's decision whether to grant a substitution of counsel is discretionary.  See United States v. Hsu, 669 F.3d 112, 122 (2d Cir. 2012).  Moreover, courts must be afforded the ability to "impose restraints on the right to reassignment of counsel in order to avoid the defendant's manipulation of the right 'so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice.'" United States v. John Doe #1, 272 F.3d 116, 122 (2d Cir. 2001) (quoting McKee, 649 F.2d at 931).  In considering whether a federal trial court has abused its discretion in this area, the Second Circuit employs a four-factor test which asks:  (1) "whether defendant made a timely motion requesting new counsel"; (2) "whether the trial court adequately inquired into the matter"; (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense"; and (4) "whether the defendant substantially and unjustifiably contributed to the

28

breakdown in communication." Id. at 122-23 (internal quotation marks omitted).  The

second and third of these factors are considered the most critical.  Lopez v. Graham, No.

10 Civ. 0468 (NGG), 2012 WL 1865502, at *11 (E.D.N.Y. May 22, 2012).

   AEDPA, of course, requires federal habeas courts to apply a considerably

more deferential standard of review when considering habeas petitions.  See 28 U.S.C.

§ 2254(d).  Judges in the Second Circuit nevertheless have found the four-factor test

"instructive in determining whether the state courts' adjudication of [a] Sixth Amendment

claim was a reasonable application of an established constitutional right."  See Allison v.

Khahaifa, No. 10 Civ. 3453 (KAM), 2011 WL 3298876, at *10 (E.D.N.Y. Aug. 1, 2011).

It is therefore appropriate to consider the John Doe factors, while also keeping in mind

AEDPA's deferential framework of review.

   The fourth John Doe factor cuts in Brown's favor.  Indeed, there is nothing

in the record to suggest that Brown "substantially and unjustifiably contributed to the

breakdown in communication" between him and Mr. Mitchell.  John Doe, 272 F.3d at

123.  Rather, Mr. Mitchell made it quite clear that his inability to meet with Brown prior

to the pretrial hearing was entirely his fault.  (H. 5).

   All three remaining factors, however, weigh against Brown.  Turning first

to the timeliness factor, Brown did not present his pro se motion until November 27,

2006, the day that the suppression hearing was to be held.  Although this arguably may

have been Brown's first opportunity to draw the Court's attention to his written motion, it

is noteworthy that Brown had been in court on September 20, 2006, at which time he

voiced no complaint whatsoever concerning Mr. Mitchell.  (Ex. D-5).  Moreover, at that

time, Justice Wiley set November 8, 2006, as the next court date.  (Id.).  Had Brown made

his request on September 20 or at any time before November 8, Justice Wiley potentially

could have granted it without delaying the trial.  The lateness of Brown's application thus

cuts against Brown.  See John Doe, 272 F.3d at 123 (expressing timeliness concern

because defendant filed motions for substitution only days before jury selection began

and then, again, immediately before trial was to commence).

       The second factor similarly weighs against Brown.  A court should, of

course, inquire into the reasons a defendant is dissatisfied with his current counsel before

denying a request for substitution, unless those reasons are apparent.  Id. at 123; McKee,

649 F.2d at 934; see also People v. Porto, 16 N.Y.3d 93, 100 (2010) ("court must make at

least a minimal inquiry" if presented with "specific factual allegations" concerning

"serious" problems with counsel) (internal quotation marks omitted).  In that regard,

although Justice Wiley initially stated that he would deny Brown's motion in light of his

prior warning about further substitutions of counsel, he thereafter afforded Mr. Mitchell

the opportunity to explain the basis for Brown's motion.  (See Ex. D-9 at 2-3).  In fact,

Mr. Mitchell conceded that he had not been able to meet with Brown to discuss the case,

and that he himself therefore was concerned about his ability to provide meaningful

representation.  Although the Justice did not address Brown directly, he had been handed

a written motion which detailed Brown's various complaints.  Brown consequently

cannot contend that the trial court failed to conduct an adequate inquiry into the basis of

his motion for substitution.  See United States v. Simenov, 252 F.3d 238, 241 (2d Cir. 2001) (quoting McKee, 649 F.2d at 934) ("If the reasons are made known to the court, the court may rule without more.").  The second John Doe factor therefore weighs against Brown.

Finally, as his repeated efforts to have this Court presume prejudice impliedly recognize, Brown cannot prevail on the third John Doe factor, which considers "whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense."  272 F.3d at 122.  In its decision, the Appellate Division found that Mr. Mitchell "provided meaningful representation," and that Brown could not have suffered any prejudice due to the failure to replace him because the People's evidence of Brown's guilt was "overwhelming." Brown, 934 N.Y.S.2d at 416.  Tellingly, Brown has made no effort to refute these findings, which must be presumed to be correct.

In sum, three of the four John Doe factors cut against Brown, including the second and third factors which are arguably the most important, since they "speak most directly to the merits of [Brown's] motion and the reasonableness of the trial court's ruling on those merits."  Lopez, 2012 WL 1865502, at *11.  For that reason, and in the absence of any showing of prejudice, Brown plainly is not entitled to habeas relief based on the Appellate Division's rejection of his substitution-of-counsel claim.

IV.    Conclusion

   For the foregoing reasons, Brown's Petition should be denied.  In addition, because Brown has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c), a certificate of appealability should not issue.

V.    Notice of Procedure for Filing Objections to this Report and Recommendation

   The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of Honorable Alvin K. Hellerstein at the United States Courthouse, 500 Pearl Street, New York, New York 10007, to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Hellerstein.  The failure to file thesetimely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

   SO ORDERED.

Dated:  New York, New York
    May 12, 2016

           _____
           FRANK MAAS
          United States Magistrate Judge

Copies to all counsel via ECF